1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

TARZ MITCHELL,                          )          3:08-cv-0382-ECR (RAM)
                                        )
            Plaintiff,                  )
                                        )     **REPORT AND RECOMMENDATION**
     vs.                                )     **OF U.S. MAGISTRATE JUDGE**
                                        )
ABRAHAM LOPEZ, *et al.*,                )
                                        )
            Defendants.                 )
_____)

This Report and Recommendation is made to the Honorable Edward C. Reed, Jr., Senior United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.  Before the court is Defendants' Motion for Summary Judgment. (Doc. # 37.)[1]  Plaintiff has opposed (Doc. # 51) and Defendants replied (Doc. #53).   After a thorough review, the court recommends that the motion be granted, in part, and denied, in part.

## I.  BACKGROUND

At all relevant times, Plaintiff Tarz Mitchell (Plaintiff) was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl. (Doc. # 6) 1.) Defendants are NDOC officials and employees: Abraham Lopez, Jackson Hardy, James Baca, and Adam Watson. (Doc. #6 2.)  Plaintiff, a *pro se* litigant, brings this action pursuant to 42 U.S.C. § 1983.

/ / /

/ / /

_____

[1]          Refers to the court's docket number.

1    Plaintiff alleges that on February 24, 2008, while eating his evening meal, Defendant

2    Abraham Lopez (Lopez) flashed a light from the window of the gun cage in the culinary, and

3    when Plaintiff was exiting the culinary, banged his flashlight on the window.  (Doc. # 6 3.)

4    Plaintiff claims that he went to see what Lopez wanted and Lopez shoved a shotgun into his

5    chest with his hand on the trigger, and angrily demanded Plaintiff's identification card.  (*Id.*)

6    Plaintiff  asserts the he feared for his life, and complied with the demand.  (*Id.*)

7    Plaintiff asserts that he immediately reported the incident to Lopez's supervisor, Sergeant

8    Rose, and returned to his unit to file an administrative grievance, while Sergeant Rose contacted

9    Lopez about the incident.  (Doc. # 6 4.)  Plaintiff alleges that Lopez subsequently came to his

10   unit with several officers, and called him out of his cell.  (*Id.*)  Plaintiff claims that Lopez angrily

11   twisted his hands behind his back and shoved him forward into an office window and made

12   several intimidating comments in an attempt to aggravate Plaintiff and escalate the situation.

13   (*Id.*)  Plaintiff asserts that Lopez also threatened him with several disciplinary infractions.  (*Id.*

14   at 5.)  Plaintiff contends that Lopez conducted himself in this manner because he learned that

15   Plaintiff had reported his conduct to his superior, was filing a grievance against him, and was

16   filing a complaint with the Inspector General.  (*Id.* at 4.)

17   In Count I, Plaintiff alleges that Lopez pointed a gun at his chest at point blank range

18   without any penological purpose, in violation of the Eighth Amendment.  (Doc. #6 6.)

19   Count I also alleges a civil conspiracy.  (*Id.* at 6-7.)  Specifically, Plaintiff alleges that he

20   complained of Lopez's actions to Defendants Watson and Baca, and these defendants either

21   denied that Lopez committed the acts or claimed the acts were justified, thereby conspiring with

22   Lopez to deprive Plaintiff of his civil rights.  (*Id.*)

23   In Count II, Plaintiff alleges retaliation in violation of the First Amendment.  (Doc. #6

24   8-9.)  Plaintiff claims that after Lopez learned that Plaintiff reported the incident to his superior

25

26

27

28                                                          2

1 and was filing a grievance, Lopez retaliated against Plaintiff by harassing, threatening, and

2 intimidating him, and then filing several disciplinary charges.  (*Id.*)[2]

3 ## II.  LEGAL STANDARD

4 The purpose of summary judgment is to avoid unnecessary trials when there is no dispute

5 over the facts before the court.  *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d

6 1468, 1471 (9th Cir.  1994) (citation omitted).  All reasonable inferences are drawn in favor of

7 the non-moving party.  *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008)(citing *Anderson v.

8 Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Summary judgment is appropriate if "the

9 pleadings, the discovery and disclosure materials on file, and any affidavits show that there is

10 no genuine issue as to any material fact and that the movant is entitled to judgment as a matter

11 of law." *Id.* (quoting Fed.R.Civ.P. 56©).  Where reasonable minds could differ on the material

12 facts at issue, however, summary judgment is not appropriate.  *Warren v.  City of Carlsbad*,

13 58 F.3d 439, 441 (9th Cir.  1995).

14 The moving party bears the burden of informing the court of the basis for its motion,

15 together with evidence demonstrating the absence of any genuine issue of material fact.  *Celotex

16 Corp.  v.  Catrett*, 477 U.S. 317, 323 (1986).  Although the parties may submit evidence in an

17 inadmissible form, only evidence which might be admissible at trial may be considered by a trial

18 court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56©.

19 In evaluating the appropriateness of summary judgment, three steps are necessary: (1)

20 determining whether a fact is material; (2) determining whether there is a genuine issue for the

21 trier of fact, as determined by the documents submitted to the court; and (3) considering that

22 evidence in light of the appropriate standard of proof.  *Anderson*, 477 U.S. at 248.  As to

23 materiality, only disputes over facts that might affect the outcome of the suit under the

24

25

26 [2]    In its screening order (Doc. # 5), the court dismissed Plaintiff's equal protection claim in Count I, without prejudice.  (*Id*. at 7-9.)  The court also dismissed Plaintiff's due process claim in Count III, with prejudice, and his equal protection claim in Count III, without prejudice.  (*Id*.)

27

28                                                    3

1   governing law will properly preclude the entry of summary judgment; factual disputes which

2   are irrelevant or unnecessary will not be considered. *Id*.

3          In determining summary judgment, a court applies a burden shifting analysis. "When

4   the party moving for summary judgment would bear the burden of proof at trial, 'it must come

5   forward with evidence which would entitle it to a directed verdict if the evidence went

6   uncontroverted at trial.' In such a case, the moving party has the initial burden of establishing

7   the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

8   *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)(citations omitted).

9   In contrast, when the nonmoving party bears the burden of proving the claim or defense, the

10  moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential

11  element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed

12  to make a showing sufficient to establish an element essential to that party's case on which that

13  party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-24. If the moving party

14  fails to meet its initial burden, summary judgment must be denied and the court need not

15  consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60

16  (1970).

17         If the moving party satisfies its initial burden, the burden shifts to the opposing party

18  to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

19  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

20  the opposing party need not establish a material issue of fact conclusively in its favor. It is

21  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

22  parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

23  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(citation omitted). In other words, the nonmoving party

24  cannot avoid summary judgment by relying solely on conclusory allegations that are

25  unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation

26  omitted). Instead, the opposition must go beyond the assertions and allegations of the pleadings

27

28

1    and set forth specific facts by producing competent evidence that shows a genuine issue for trial.

2    *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

3        At summary judgment, a court's function is not to weigh the evidence and determine the

4    truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

5    While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be

6    drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

7    significantly probative, summary judgment may be granted.  *Id*. at 249-50, 255 (citations

8    omitted).

9                                **III.  DISCUSSION**

10   **A.    EXHAUSTION**

11        **1.    Standard**

12        The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with

13   respect to prison conditions under section 1983 of this title, or any other Federal law, by a

14   prisoner confined in any jail, prison, or other correctional facility until such administrative

15   remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  An inmate must exhaust his

16   administrative remedies irrespective of the forms of relief sought and offered through

17   administrative avenues.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).  The Supreme Court has

18   clarified that exhaustion cannot be satisfied by filing an untimely or otherwise procedurally

19   infirm grievance, but rather, the PLRA requires "proper exhaustion."  *Woodford v. Ngo*, 548

20   U.S. 81, 90 (2006).  "Proper exhaustion" refers to "using all steps that the agency holds out, and

21   doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* (citation omitted)

22   (emphasis in original).

23        This court has interpreted *Woodford* as setting forth two tests for "proper exhaustion":

24   (1) the "merits test," satisfied when a plaintiff's grievance is fully addressed on the merits by

25   the administrative agency and appealed through all the agency's levels, and (2) the "compliance

26   test," satisfied when a plaintiff complies with all critical procedural rules and deadlines. *Jones*

27   *v. Stewart*, 457 F.Supp.2d 1131, 1134 (D. Nev. 2006).  "A finding that a plaintiff has met either

28                                        5

test is sufficient for a finding of 'proper exhaustion'." *Id*.  In other words, "a defendant must show failure to meet both tests to succeed" in dismissing a complaint for failure to exhaust administrative remedies.  *Id*. at 1136.

The failure to exhaust is an affirmative defense, and a defendant bears the burden of raising and proving failure to exhaust. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003). The failure to exhaust administrative remedies is treated as a matter in abatement, and is properly raised in an unenumerated 12(b) motion. *Wyatt*, 315 F.3d at 1119 (citations omitted); *see also Ritza v. Int'l Longshoremen's and Warehousemen's Union*, 837 F.2d 365, 368 (9th Cir. 1988).  As such, failure to exhaust is not properly raised in a motion for summary judgment, but if it is so raised, it should be treated as a motion to dismiss. *Ritza*, 837 F.2d at 368 (citations omitted). If the court ultimately finds that Plaintiff has not exhausted his nonjudicial remedies, the proper remedy is dismissal of his claims without prejudice. *Wyatt*, 315 F.3d at 1119-20, as noted in *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1059 (9th Cir. 2007); *see also Ritza*, 837 F.2d at 368.  In *Ritza*, the court noted the distinction between summary judgment and dismissal for matters in abatement as it concerns the court's authority to resolve factual disputes:

> [One] reason why a jurisdictional or related type of motion, raising matter in abatement…, should be distinguished from a motion for summary judgment relates to the method of trial.  In ruling on a motion for summary judgment the court should not resolve any material factual issue…If there is such an issue it should be resolved at trial…On the other hand, where a factual issue arises in connection with a jurisdictional or related type of motion, the general view is that there is no right of jury trial as to that issue…and that the court has a broad discretion as to the method to be used in resolving the factual dispute.

*Ritza*, 837 F.2d at 369 (citations omitted).  Therefore, the court must treat the exhaustion issue as one raised in an unenumerated 12(b) motion, and is tasked with resolving factual issues that arise.

### 2.    Exhaustion Procedure

For prisoners within the NDOC system, exhaustion of administrative remedies requires compliance with the Inmate Grievance Procedures set forth in the NDOC Administrative Regulation 740 (AR 740).  (Doc. # 37 7, Ex. C.)  At the time the allegations of Plaintiff's

6

1    complaint took place, the administrative process consisted of: (1) an informal level grievance

2    that is reviewed and responded to by an inmate caseworker (Informal Level Grievance); (2) a

3    first level formal written grievance appealing the informal grievance decision to the warden at

4    the institution where the inmate is housed (First Level Grievance); and (3) a second level

5    grievance appealing the first level grievance decision, which is decided by the Assistant Director

6    of Operations, Assistant Director of Support Services, Offender Management Administrator,

7    Medical Director, or Correctional Programs Administrator (Second Level Grievance). (Doc. #

8    37 Ex. C at 57 (effective January 5, 2004).)  If an inmate disagrees with the response to any

9    grievance, he may appeal the grievance to the next available level within the prescribed

10   deadlines.  (Doc. # 37 Ex. C at 58.)

11        **3.    Analysis**

12        The court will now address whether Defendants have met their burden necessary to

13   achieve a dismissal of Plaintiff's claims.

14        Defendants argue that Plaintiff did not properly exhaust his nonjudicial remedies because

15   he did not complete all three steps of the grievance procedure with respect to the February 24,

16   2008 incident. (Doc. # 37 10.) Specifically, Defendants argue that Plaintiff's complaint states

17   that he properly exhausted under Grievance Log Number 20062689788; however, while he did

18   complete all levels of Grievance Log Number 20062689788, the Informal Level Grievance

19   complains about the incident on February 24, 2008, but the First Level Grievance and Second

20   Level Grievance appeal the disciplinary hearing officer's findings against him on March 16,

21   2008. (*Id.*)

22        In his opposition, Plaintiff argues that he tried to completely exhaust his nonjudicial

23   remedies but was precluded from doing so by prison officials' conduct and is thereby excused

24   from the exhaustion requirement. (Doc. # 51 2-7.)  Plaintiff asserts that: (1) he submitted his

25   Informal Level Grievance concerning the February 24, 2008 incident; (2) Defendants responded

26   by both denying the grievance and indicating that the issues addressed therein were being

27   forwarded to the Inspector General for investigation; (3) he tried to complete the remaining

28        7

steps of the grievance process by filing a First Level Grievance; (4) however, the First Level Grievance was denied as improper, stating that the issues were already being addressed in grievance 20062689788, and as such was duplicative. (*Id.*) Plaintiff asserts that this conduct precluded him from completing the grievance process, and that the time frames for exhaustion were suspended pursuant to AR 740.02.1.4.2.4 because he never received a disposition of the Inspector Generals' investigation. (Doc. # 51 2-3.)

In their reply, Defendants assert that Plaintiff was required to complete all three steps of the grievance process even if his claim was being investigated. (Doc. # 53 2-3.) Defendants rely on AR 740.05.11.B to support this argument. (Doc. # 53 2:22-24.) Defendants refer the court to Exhibit C at page 54 of their motion for the source of this regulation. (*Id.*) However, this version of AR 740, which was controlling in 2008, does not contain provision AR 740.05.11.B. Instead, AR 740.02.1.2.1 and AR 740.02.1.4.2.4 require that allegations of inmate abuse by prison staff or employees be immediately reported to the Grievance Coordinator, the Warden, and the Inspector General for review. (Doc. # 37 58, 62.) AR 740.02.1.4.2.4 further provides that the grievance time frames are suspended until a disposition is received from the Inspector General's Office. (*Id.*) The court notes that the current version of AR 740, effective January 14, 2009, does contain AR 740.05.11.B, requiring completion of all three steps of the grievance process even if a claim is being investigated.

In support of their argument, Defendants provide the Declaration of Shell Zappettini, Associate Warden of Programs at Nevada State Prison, who performed a search of Plaintiff's grievance file and attached a copy of Grievance Log Number 20062689788. (Doc. # 37 95 ¶ 4, 96-107.) From the documents provided, it appears that Plaintiff filed an Informal Level Grievance (Log Number 20062689788) on February 25, 2008, concerning the events that transpired on February 24, 2008. (Doc. # 37 97-99.) The prison responded on March 13, 2008, denying the grievance and indicating that the issues raised were being forwarded to the Inspector General for further investigation. (Doc. # 37 97.) Plaintiff indicated his disagreement on March 18, 2008. (*Id.*)

1       Defendants also provide a First Level Grievance signed by Plaintiff on March 17, 2008,

2   that is postured as an appeal of the disciplinary hearing held on March 16, 2008.  (Doc. # 37

3   96.)  The grievance was denied and refers Plaintiff to an attached memorandum, although it

4   seems Defendants did not actually provide the referenced memorandum.  (*Id.*)

5       Defendants provide a document which appears to be a response from the Inspector

6   General stating that the Warden should perform a use of force review, and if deficient, request

7   an investigation.  (Doc. # 37 104.)  Next, Defendants provide a memorandum dated March 6,

8   2008, addressed to Pam DelPorto from Lieutenant Henley.  (Doc. # 37 105.)  This document

9   states that Warden Donat was aware of Plaintiff's excessive force claim and wanted an

10  investigation initiated.  (*Id.*)  Defendants provide a second memorandum dated April 14, 2008,

11  to Plaintiff from Warden Donat, indicating that Plaintiff's Disciplinary Appeal was denied .

12  (Doc. # 37 106.)  Lastly, Defendants provide an Inmate Issue History referring to Plaintiff's

13  grievances.  (Doc. # 37 107.)

14      Plaintiff provides the court his First Level Grievance submitted on March 21, 2008,

15  wherein he states his reasons for disagreeing with the disposition of his Informal Level

16  Grievance related to the February 24, 2008 incident.  (Doc. # 51 31.)  Plaintiff argued that the

17  Informal Level Grievance was prematurely denied because the matter had been referred to the

18  Inspector General for investigation.   (*Id.*)   Plaintiff also referred Defendants to AR

19  740.02.1.4.2.4, suspending grievance time frames pending disposition of the Inspector General's

20  investigation. (*Id.*) Defendants responded by denying the grievance as improper; stating that

21  the issue asserted in the First Level Grievance was already being addressed in grievance

22  20062689788, and was therefore duplicative and would be assigned a new log number.  (*Id.*

23  at 30-31.)

24      Viewing the evidence in the light most favorable to Plaintiff, the court finds that

25  Defendants have not met their burden of proving that Plaintiff failed to exhaust available

26  nonjudicial remedies.  The court is particularly troubled by Defendants' position that Plaintiff

27  failed to exhaust available nonjudicial remedies because was required to complete all three steps

28

of the grievance process even when his complaint was being investigated by the Inspector General.

First, the administrative regulation that Defendants rely on to support this requirement was not in effect when Plaintiff was pursuing the grievance process related to this incident. As discussed above, the version of AR 740 in effect in 2008 provided that: (1) allegations of inmate abuse by prison staff or employees were to be immediately reported to the Inspector General for review (AR 740.02.1.2.1, AR 740.02.1.4.2.4 (Doc. # 37 58, 62)); and (2) grievance time frames are suspended until a disposition is received from the Inspector General's Office (*Id.*). This version of AR 740 did not contain the provision set forth at AR 740.05.11.B, requiring completion of all steps of the grievance process when an investigation is pending.

Next, even though AR 740 did not specifically require it at that time, Plaintiff took reasonable steps to complete the remaining steps of the grievance process. Plaintiff's efforts were stymied after filing his First Level Grievance in response to the denial of his Informal Level Grievance concerning the February 24, 2008 incident. (Doc. # 51 31.) The court finds that the position taken by Defendants is inconsistent. On the one hand, Defendants argue that Plaintiff was required to complete all three steps of the grievance procedure. However, when Plaintiff tried to complete the remaining steps of the grievance procedure, he was told that the issue was already being addressed and that the First Level Grievance was duplicative. (Doc. # 51 30-31.) In addition, it is not clear to the court how Defendants can take the position that the First Level Grievance filed with respect to the disciplinary hearing does not relate to the February 24, 2008 incident when the prison, correctly or incorrectly, stated that the issues asserted in the First Level Grievance (Doc. # 51 31) were being addressed in Plaintiff's other First Level Grievance which related to the disciplinary hearing.

Finally, the court notes that Defendants do not refute Plaintiff's contention that he was never notified of the disposition of the Inspector General's investigation. Nor is there any evidence before the court that serves to refute this contention.

The PLRA requires that an inmate exhaust only those administrative remedies "as are available." 42 U.S.C. § 1997e(a). The Ninth Circuit has recognized that the PLRA "does not require exhaustion when circumstances render administrative remedies 'effectively unavailable.'" *Sapp v. Kimbrell*, 623 F.3d 813, 822 (9th Cir. 2010) (citing *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010)). *Sapp* specifically discussed a Third Circuit case where the court excused failure to exhaust where guards erroneously informed an inmate that he had to wait until an investigation was complete before filing a grievance. *Sapp*, 623 F.3d at 822-23 (citing *Brown v. Croak*, 312 F.3d 109, 111-12 (3d Cir. 2002)). In *Brown*, the Third Circuit considered whether an inmate could rely on instructions by prison officials that he had to await the outcome of a pending investigation, when this ultimately rendered the grievance procedure unavailable to him. *Brown*, 312 F.3d at 112. There, the court determined that "[a]ssuming security officials told [the inmate] to wait for the termination of the investigation before commencing a formal claim, and assuming the defendants never informed Brown that the investigation was completed, the formal grievance proceeding required...was never 'available' to [the inmate] within the meaning of 42 U.S.C. § 1997e." *Brown*, 312 F.3d at 113 (citing *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (holding that "a remedy that prison officials prevent a prisoner from 'utilizing' is not an 'available' remedy under § 1997e")).

Here, it appears to the court that Plaintiff took reasonable and appropriate steps to exhaust his claims but was precluded from doing so when prison officials denied his First Level Grievance concerning the February 24, 2008 incident as improper. In doing so, prison officials stated that Plaintiff's First Level Grievance was duplicative of the First Level Grievance filed with respect to his disciplinary hearing. Defendants now claim that the First Level Grievance and Second Level Grievance filed with respect to the disciplinary hearing had no relation to the Informal Level Grievance filed concerning the February 24, 2008 incident. Moreover, believing Plaintiff's version of events, Plaintiff was never notified of the disposition of the Inspector General's investigation, and as in *Brown*, the court finds that the subsequent grievance procedures required were therefore never "available" to Plaintiff. Because Defendants have not

1   met their burden of proving Plaintiff's failure to exhaust, Plaintiff's claims should not be

2   dismissed on this ground.

3   **B.      COUNT I**

4          **1.      Excessive Force**

5          Defendants argue that Lopez's act of pointing a shotgun loaded with a blank round at

6   Plaintiff to force him to comply with orders does not constitute excessive force. (Doc. # 37 10-

7   12.)  Plaintiff claims that the force used was excessive. (Doc. # 51 7-14.)

8          The Eighth Amendment prohibits cruel and unusual punishment in the prison setting.

9    This includes the use of excessive force. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992) ("'the

10  unnecessary and wanton infliction of pain…constitutes cruel and unusual punishment forbidden

11  by the Eighth Amendment.'" (citation omitted)).  "[W]henever prison officials stand accused

12  of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the

13  core judicial inquiry is…whether force was applied in a good-faith effort to maintain or restore

14  discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.  "In

15  determining whether the use of force was wanton and unnecessary, it may also be proper to

16  evaluate the need for application of force, the relationship between that need and the amount

17  of force used, the threat reasonably perceived by the responsible officials, and any efforts made

18  to temper the severity of a forceful response." *Id*. (internal quotations and citations omitted).

19  The extent of injury suffered by the inmate is another factor; however, while "[t]he absence of

20  serious injury is…relevant to the Eighth Amendment inquiry, [it] does not end it." *Id*. at 7.  The

21  extent of injury "is one factor that may suggest 'whether the use of force could plausibly have

22  been thought necessary' in a particular situation" and may provide an indication of the amount

23  of force applied.  *Id*. (citation omitted).

24          "What is necessary to show sufficient harm for purposes of the Cruel and Unusual

25  Punishment Clause [of the Eighth Amendment] depends upon the claim at issue…" *Hudson*,

26  503 U.S. at 8.  "In the excessive force context…[w]hen prison officials maliciously and

27  sadistically use force to cause harm, contemporary standards are always violated…whether or

28                                                    12

1    not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical
2    punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity
3    of injury." *Id.* at 9 (citations omitted).   However, not "every malevolent touch by a prison guard
4    gives rise to a federal cause of action."  *Id.* (citation omitted).  "The Eighth Amendment's
5    prohibition of cruel and unusual punishments necessarily excludes from constitutional
6    recognition *de minimis* use of physical force, provided that the use of force is not of a sort
7    repugnant to the conscience of mankind."   *Id.* at 9-10 (internal quotations and citations
8    omitted).

9         The court in *Hudson* clearly held that the use of excessive force against an inmate may
10   constitute cruel and unusual punishment in violation of the Eighth Amendment, even in the
11   absence of serious injury.  In *Wilkins v. Gaddy*, the Supreme Court expanded on its holding
12   insofar as it concerns "*de minimis*" force.  *Wilkins v. Gaddy*, 130 S.Ct. 1175 (2010).  There, the
13   district court dismissed an excessive force claim, determining that the injuries suffered by the
14   prisoner were *de minimis*.  *Id.* at 1176-77.  The appellate court affirmed the dismissal, and the
15   Supreme Court reversed and remanded.  *Id.*  The Supreme Court noted that "[i]njury and
16   force…are only imperfectly correlated, and it is the latter that ultimately counts.  An inmate who
17   is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim
18   merely because he has the good fortune to escape without serious injury." *Id.* at 1178-79.  Thus,
19   the question in this case turns on whether the force allegedly applied by Lopez in each incident
20   was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically
21   for the purpose of causing harm.  *Hudson*, 503 U.S. at 7.

22        For summary judgment purposes, the court takes the facts in the light most favorable
23   to the non-moving party and determines whether the moving party is, nevertheless, entitled
24   to judgment as a matter of law.  Here, drawing all inferences in favor of Plaintiff, the court
25   cannot say as a matter of law that Defendants are entitled to summary judgment.  The disputed
26   facts prevent the court from resolving issues concerning both the incident in the culinary and
27   subsequent incident in the rotunda at this juncture.

28
                                        13

### a.    The Culinary Incident

According to Lopez, Plaintiff was in the culinary when Lopez noticed that Plaintiff had finished his meal, and instead of returning his tray to the kitchen and exiting the culinary building, Plaintiff remained seated at his table with at least one other inmate. (Ex. A to Defs.' Mot. for Summ. J. (Lopez Decl.) ¶ 9.) Lopez attempted to get Plaintiff's attention by flashing his flashlight toward Plaintiff, who turned toward him, and then Lopez pointed toward the exit, indicating that it was time for Plaintiff to leave the culinary. (*Id*.) Plaintiff did not leave the culinary, but instead, continued his conversation with another inmate. (*Id*.) At this point, Lopez knocked on the glass to get Plaintiff's attention and stated "you're done, you gotta go," to which Plaintiff responded, "f*** you, I'll leave when I'm ready." (*Id*. at 10.) While Lopez unsuccessfully attempted to contact other culinary floor officers via radio, Plaintiff got up from his table and walked to return his tray. (*Id*. at 11.) Lopez eventually got the attention of Lieutenant Bianchi via flashlight, and he subsequently approached the culinary gun cage at about the same time that Plaintiff was exiting the culinary building to the outside corridor. (*Id*. at ¶¶ 11-12.) Lopez then ran to the other end of the culinary gun post and motioned for Plaintiff to approach, and Plaintiff ignored him and started to walk faster. (*Id*. at ¶ 12.) To enforce compliance with his orders, Lopez retrieved the shotgun, loaded it with a blank round, and positioned it in the gun portal, pointed it at Plaintiff and ordered Plaintiff to stop and provide his identification card. (*Id*. at ¶ 13.) Plaintiff handed Lopez his identification card and Lopez told Plaintiff he would meet with him later to speak about the incident and return his identification card. (*Id*.)

Lopez claims that aiming the shotgun at Plaintiff was justified because the culinary was a volatile place, Plaintiff was antagonizing staff, and Lopez was concerned that Plaintiff's conduct could cause a riot, or that he would repeat this behavior in the future. (Lopez Decl. ¶ 14.) Defendants also point out that Plaintiff was eventually found guilty of general violations of the Code of Penal Discipline in connection with the culinary incident. (Doc. # 37 6:14-20, Ex. D.)

14

Plaintiff maintains that Lopez's conduct in the culinary constitutes excessive force. According to Plaintiff, on February 24, 2008, while dining in the culinary, he complied with all of Lopez's commands, and while he was leaving the culinary Lopez shoved a shotgun through the gun cage slot into his chest and asked for his identification card, causing him to fear for his life. (Doc. # 51 Ex. 1 at ¶¶ 3-5.) Plaintiff claims that he immediately reported Lopez's conduct to Sergeant Rose, who contacted Lopez at the culinary gun cage post about the incident. (*Id.* at ¶ 5.) Plaintiff's claim that Lopez extended the shotgun out of the culinary gun cage at pointed it directly at Plaintiff at point blank range is corroborated by inmates Juan Manning and Edward Finley. (Doc. # 51 at 58, 59.) The court notes that inmate Manning does not indicate whether or not the shotgun was shoved into Plaintiff's chest, but he claims that it was extended out of the gun cage and pointed directly at Plaintiff (Doc. # 58) while inmate Finley states that the shot gun did hit Plaintiff in the chest (Doc. # 59).

The foregoing demonstrates that disputed issues of material fact exist as to Plaintiff's claim that Defendant Lopez engaged in conduct amounting to excessive force in connection with the culinary incident. Viewing the evidence in the light most favorable to Plaintiff, the court finds that a reasonable jury could conclude that Lopez's action of shoving a gun into Plaintiff's chest constitutes excessive force under the circumstances. While Lopez maintains that he was acting to maintain security and order in response to Plaintiff's failure to obey his commands, Plaintiff disputes this and claims that he did not disobey orders. (*See* Doc. # 51 Ex. 1 at ¶ 3, Ex. 8.) Plaintiff also disputes that Lopez tried to get Plaintiff's attention several times before he resorted to pointing his weapon at Plaintiff. (*See* Doc. # 51 87.) Plaintiff maintains that Lopez's purpose in calling Plaintiff to the culinary gun window was not that Plaintiff had disobeyed prior orders, but was simply to obtain his inmate identification card. (Doc. # 51 Ex. 1 at ¶ 4.) Plaintiff submits Defendants' responses to his request for admissions wherein Defendants admit that it is not proper training for an officer to pull a shotgun on an inmate solely to obtain his identification card. (Supp. Response to Request for Admission No. 3 (Doc. # 51 Ex. 7).) Defendants also admit that it is not proper training or protocol for an officer to make physical

15

contact with an inmate with a shotgun, and that there is a minimum distance that must be maintained by a correctional officer pulling a shotgun on an inmate. (Supp. Response to Request for Admission No. 4 and 11 (Doc. # 51 Ex. 7).)

Accordingly, the court finds that the evidence provided by Plaintiff is sufficient to raise genuine issues of material fact as to whether the alleged force was carried out "maliciously and sadistically" rather than as part of "a good faith effort to maintain or restore discipline." Therefore, summary judgment should be denied as to this claim.

### b.    The Rotunda Incident

Additionally, Plaintiff claims that Lopez applied excessive force after he reported Lopez to his sergeant, when Lopez gathered two other officers and surrounded Plaintiff in the Unit 10 rotunda, twisted Plaintiff's hands and slammed him into the window of the caseworker's office. (Doc. # 51 Ex. at ¶ 7.)  Plaintiff's account of this incident is corroborated by inmate Alo Faituli. (Doc. # 51 64.)

Lopez, on the other hand, claims that he did not engage in conduct amounting to excessive force. According to Lopez, after his shift ended in the culinary, he met with Plaintiff in Unit 10, along with Officer Elliott and Lieutenant Bianchi. (Lopez Decl. ¶ 15.) Lopez maintains that Plaintiff was merely removed from his cell, handcuffed and pat searched before he was escorted into the common area of the unit rotunda. (*Id.*) In addition, Lopez claims that he told Plaintiff, in a calm voice, that he did not have time to focus all of his attention on Plaintiff in the culinary, and that he should stop acting like an idiot in the culinary because it was not the place to do so. (*Id.*) He also notified Plaintiff that he would be receiving a Notice of Charges for his conduct. (*Id.*)

There is clearly a material factual dispute concerning what occurred in the rotunda. Believing Plaintiff's version of events, that Lopez twisted Plaintiff's hands and slammed him into a window for no legitimate penological purpose, a reasonable jury could conclude that Lopez engaged in conduct amounting to excessive force. While Defendants contend there is no evidence that Lopez harmed Plaintiff and that Officer Elliott had the only contact with

1   Plaintiff (Doc. # 37 at 6:3-5), Lopez does not offer this evidence in his declaration and
2   Defendants did not submit a declaration on behalf of Officer Elliott.  Moreover, Plaintiff
3   specifically states in his own declaration that it was Lopez that twisted his hands upward and
4   slammed him into the caseworker's window.  (Doc. # 51 Ex. 1 at ¶ 7.)  As with the culinary
5   incident, there is a factual dispute here regarding whether the alleged force was carried out
6   "maliciously and sadistically" rather than as part of "a good faith effort to maintain or restore
7   discipline."  Therefore, summary judgment should be denied as to this claim.

8        Finally, the court points out that Defendants did not discuss the degree of Plaintiff's
9   injuries as a factor to be considered as evidence of the degree of force used.  As the Supreme
10  Court noted in *Wilkins*,  if a jury believes Plaintiff's version of events and finds that Lopez's
11  conduct constitutes excessive force, while a defendant cannot escape liability for the use of force
12  simply because a plaintiff was particularly resilient and failed to suffer any treatable injury, the
13  jury will be tasked with determining the amount of damages in light of the nature of Plaintiff's
14  alleged injuries. *See Wilkins*, 130 S.Ct. at 1178-80; *see also Hudson*, 503 U.S. at 9.

15       **2.     Conspiracy**

16       Plaintiff alleges that Defendants have engaged in an unlawful conspiracy under 42 U.S.C.
17  § 1986. (Doc. # 6 3, 6-7.)  Plaintiff claims that he complained of Lopez's actions to Defendants
18  Watson and Baca, and they either denied that Lopez committed the actions or stated that his
19  actions were justified.  (*Id*. at 6-7.) Defendants argue that Plaintiff's civil conspiracy claim fails
20  because the defendants could not have formed an agreement to violate his constitutional rights
21  because they were not notified of the February 24, 2008 incident until after it occurred.  (Doc.
22  # 37 14.)

23       Plaintiff cites to 42 U.S.C. § 1986 for his civil conspiracy claim.  (Doc. # 6 3, 6-7.)  This
24  section pertains to an action for neglect to prevent conspiracy to interfere with civil rights, and
25  requires a valid claim under 42 U.S.C. § 1985. *Karim-Panahi v. L.A. Police Dep't,* 839 F.2d 621,
26  626 (9th Cir. 1988)(citations omitted).
27  / / /
28

To prevail on a claim for conspiracy to violate one's constitutional rights under 42 U.S.C. § 1983, the plaintiff must show specific facts to support the existence of the claimed conspiracy. *Karim-Panahi*, 839 F.2d at 626. The elements of a conspiracy claim brought under section 1983 are: (1) an agreement or meeting of the minds to violate constitutional rights, and (2) an actual deprivation of those rights resulting from the alleged conspiracy. *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002)*; Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Franklin*, 312 F.3d at 441 (quotations and citations omitted).

Here, while Plaintiff alleges a conspiracy, there is no evidence to support the existence of an agreement or meeting of the minds between defendants, whether the agreement be specific or inferred from conduct. Nor does Plaintiff provide any evidence that the deprivation of his rights was the *result* of such an agreement. As such, Defendants have met their burden of establishing the absence of any genuine issue of material fact with respect to Plaintiff's conspiracy claim. Plaintiff has failed to meet his burden of producing evidence sufficient to raise a genuine issue of material fact as to the existence of a conspiracy between Defendants. As a result, Defendants are entitled to summary judgment on Plaintiff's conspiracy claim.

### 3.    State Law Claims

Plaintiff alleges that Lopez violated his rights under NRS §212.020 and NRS 197.200. (Doc. # 6 6.)

Courts have long established that "'criminal statutes cannot be enforced by civil actions.'" *Collins v. Palczewski*, 841 F.Supp. 333, 340 (D.Nev. 1993)(quoting *Bass Angler Sportsman Soc. V. United States Steel Corp.*, 324 F.Supp. 412, 415 (S.D. Ala. 1971)(citation omitted); *United States v. Jourden*, 193 F. 986 (9th Cir. 1912)). "Only in very limited circumstances have courts found private actions maintainable under criminal statutes. Without exception, the plaintiffs have been members of the public that the statutes were specifically designed to protect." *Collins*, 841 F.Supp. at 340 (citations omitted). Neither NRS § 212.020 nor NRS § 197.200 is

the type of criminal statute contemplated within this narrowly created exception.  NRS § 212.020 provides the classification of the offense of inhumanity to prisoners.  NRS § 197.200 provides protection to the general population of Nevada against the oppressive, injurious or confiscatory actions of state officers acting under the color of state law.  Both of these sections are strictly criminal in nature.

In addition, proper prosecuting authorities are the only ones that may enforce violations of criminal statutes, not private parties.  *See Bass Angler Sportsman Soc.*, 329 F.Supp. at 345.  In fact, NRS § 169.055, which defines a "criminal action," states that "[a] criminal action is prosecuted in the name of the State of Nevada, as plaintiff."  Plaintiff lacks standing to contest the prosecution or non-prosecution of Defendants because "he himself is neither prosecuted nor threatened with prosecution" under NRS § 212.020 or NRS § 197.200.  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)(citations omitted).  Therefore, summary judgment should be granted as to Plaintiff's state law claims brought under NRS § 212.020 and NRS § 197.200.

**C.    COUNT II**

The sole claim in Count III  is for retaliation.  Plaintiff alleges that Lopez retaliated against him for exercising a protected constitutional right under the First Amendment.  (Doc. # 6 8.)  Specifically, Plaintiff alleges that after the incident in the culinary, he immediately reported Lopez's conduct to his superior, and Lopez learned of this reporting and that Plaintiff was initiating a grievance and complaint against him.  (*Id.*, Doc. # 51 Ex. 1 at ¶ 9.)  Plaintiff claims that Lopez's superior, Sergeant Rose, contacted Lopez about Plaintiff reporting the incident via telephone while Lopez was still inside the gun cage in the culinary.  (Doc. # 51 Ex. 1 at ¶ 5.)  As a result, Plaintiff claims that Lopez went to Plaintiff's housing unit and had Plaintiff retrieved from his cell in order to harass, threaten, restrain, intimidate and aggravate Plaintiff as well as threaten him with disciplinary actions.  (Doc. # 6 8.)  According to Plaintiff, within five minutes of reporting the culinary incident to Lopez's superior, Lopez gathered two other officers and surrounded Plaintiff in the Unit 10 rotunda, where he angrily twisted Plaintiff's hands and slammed him into the window of a caseworker's office.  (Doc. # 51 Ex. 1 at ¶ 7.)

19

1   Plaintiff further asserts that Lopez's conduct did not reasonably advance a legitimate
2   correctional goal, but instead, his conduct was personal, deliberate, and intentional, in violation
3   of Plaintiff's civil rights.  (*Id.*)

4   Defendants argue that Plaintiff's retaliation claim fails because Lopez initiated the
5   disciplinary process against Plaintiff based upon his insubordinate conduct, and not in response
6   to Plaintiff reporting the incident at the culinary to Lopez's supervisor.  (Doc. # 37 12-13.)
7   Defendants assert that the charges filed against Plaintiff were supported by clear and convincing
8   evidence.  (*Id.* at 13.)

9   A plaintiff may state a claim for a violation of his First Amendment rights due to
10  retaliation under 42 U.S.C. § 1983.  *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  Such
11  a claim consists of five elements: "(1) An assertion that a state actor took some adverse action
12  against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4)
13  chilled the inmate's exercise of his First Amendment rights, and (5) the action did not
14  reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68
15  (9th Cir. 2005)(citation omitted). The prisoner must (1) submit evidence, either direct or
16  circumstantial, to establish a link between the exercise of constitutional rights and the allegedly
17  retaliatory action, and (2) demonstrate that his or her First Amendment rights were actually
18  chilled by the alleged retaliatory action.  *Pratt*, 65 F.3d at 806-07.  Timing of the events
19  surrounding the alleged retaliation may constitute circumstantial evidence of retaliatory intent.
20  *See Soranno's Gasco, Inc. V. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989).  The Ninth Circuit
21  has recognized that prisoners have a fundamental First Amendment right to file prison
22  grievances and pursue civil rights litigation, and "because purely retaliatory actions taken
23  against a prisoner for having exercised those rights necessarily undermine those protections,
24  such actions violate the Constitution quite apart from any underlying misconduct they are
25  designed to shield." *Rhodes*, 408 F.3d at 567 (citation omitted).

26  To obtain summary judgment on a claim of retaliation, Defendants have the initial
27  burden to demonstrate that there are no genuine issues of material fact supported by evidence

28

20

1   as to at least one of the essential elements of a retaliation claim and, as a result, the plaintiff

2   cannot prevail on the claim.  *Celotex*, 477 U.S. at 323.  "The plaintiff bears the burden of

3   pleading and proving the absence of legitimate correctional goals for the conduct of which he

4   complains."  *Pratt*, 65 F.3d at 806.  In analyzing a retaliation claim, a court should "afford

5   appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate

6   penological reasons for conduct alleged to be retaliatory."  *Id*. at 807 (internal quotation marks

7   and citation omitted).

8        The court finds that disputed issues of material fact remain which preclude granting

9   summary judgment on Plaintiff's retaliation claim.  While Defendants claim that there is no

10  evidence of retaliatory action (Doc. # 37 at 12-13), if Plaintiff's version of events were believed,

11  a reasonable jury could conclude  that Lopez's conduct was retaliatory.  Plaintiff claims that

12  shortly after he reported the culinary incident to Lopez's supervisor, Sergeant Rose, Lopez was

13  in contact with Sergeant Rose, and with knowledge that Plaintiff had reported him and was filing

14  a grievance against him, filed disciplinary charges against Plaintiff. (Doc. # 51 Ex. 1 at ¶¶ 6-9.)

15  Given the temporal proximity between Plaintiff's reporting of the incident and the alleged

16  retaliatory conduct, the court finds that this evidence is sufficient to raise an issue of material

17  fact as to Plaintiff's retaliation claim, and summary judgment should be denied.

18  **D.    SUPERVISORY LIABILITY**

19       Defendants Baca, Watson and Hardy argue that they cannot be held liable as Lopez's

20  supervisors because they did not know of the incident until after it occurred.  (Doc. # 37 13.)

21       Supervisory personnel are generally not liable under section 1983 for the actions of their

22  employees under a theory of *respondeat superior* and, therefore, when a named defendant holds

23  a supervisorial position, the causal link between him and the claimed constitutional violation

24  must be specifically alleged.  *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979).  To show

25  a *prima facie* case of supervisory liability, plaintiff must show that supervisory defendants

26  either: personally participated in the alleged deprivation of constitutional rights; knew of the

27  violations and failed to act to prevent them; or promulgated or implemented a policy so deficient

28

1    that the policy itself is a repudiation of constitutional rights and is the moving force of the

2    constitutional violation. *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989)(internal quotations

3    and citations omitted).

4         In support of their motion, Defendants provide declarations on behalf of Baca, Hardy,

5    and Watson. (Doc. #51 at 109-110, 112, and 114, respectively.) Defendant Baca states that he

6    has no personal knowledge of the events or dealings between Lopez and Plaintiff on February

7    24, 2008, and was first notified of the incident when he received Plaintiff's Informal Level

8    Grievance. (Doc. # 51 109 at ¶ 4.) Because Plaintiff's Informal Level Grievance alleged staff

9    misconduct, Defendant Baca forwarded it to Associate of Warden Operations, Adam Watson,

10   with instructions to forward it to the Inspector General for investigation. (*Id.* at ¶ 5.)   Baca

11   coordinated the response to Plaintiff's Informal Level Grievance as well as his First and Second

12   Level Grievances. (*Id.*) Defendant Hardy was not present or involved in the events or dealings

13   between Lopez and Plaintiff on February 24, 2008, and was selected to be the presiding officer

14   at Plaintiff's disciplinary hearing on March 16, 2008, where he made findings on the charged

15   violations resulting from Plaintiff's conduct on February 24, 2008. (Doc. # 51 112 at ¶¶ 4-5.)

16   At the time of the allegations in Plaintiff's complaint, Defendant Watson was the Associate

17   Warden of Operations at Nevada State Prison, supervising all uniformed staff including

18   correctional officers, sergeants, and lieutenants. (Doc. # 51 114 at ¶¶ 2-3.) Defendant Watson

19   has no personal knowledge of the events or dealings between Plaintiff and Lopez on February

20   24, 2008, and was first notified of the incident when he received Plaintiff's forwarded Informal

21   Level Grievance, which he forwarded to the Inspector General for investigation. (*Id.* at ¶¶ 4-5.)

22        The alleged constitutional violations are excessive force and retaliation.  There is no

23   evidence before the court that Defendants Baca, Watson or Hardy personally participated in

24   the alleged constitutional deprivations, knew of the violations and failed to act to prevent them,

25   or promulgated or implemented a policy so deficient that the policy itself is a repudiation of

26   constitutional rights. *Hansen*, 885 F.2d at 645. Accordingly, summary judgment should be

27   granted as to Defendants Baca, Watson, and Hardy.

28                                                22

1  **E.   QUALIFIED IMMUNITY**

2        Defendants argue they are entitled to qualified immunity because their actions did not

3  demonstrate any unlawful conduct. (Doc. # 37 14-15.) Specifically, Defendants argue that there

4  was no violation of Plaintiff's constitutional rights, and a reasonable prison officer would not

5  believe that using a weapon loaded with a blank round, as a last resort to gain compliance with

6  direct orders aimed at protecting the safety of staff and inmates, could be considered excessive

7  force. (*Id.*)

8        "[Q]ualified immunity protects government officials from liability for civil damages

9  insofar as their conduct does not violate clearly established statutory or constitutional rights

10 of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct.

11 808, 815 (2009) (citation and internal quotations omitted). Under certain circumstances, state

12 officials are entitled to qualified immunity when sued in their personal capacities. *Carey v.*

13 *Nev. Gaming Control Bd.*, 279 F.3d 873, 879 (9th Cir. 2002). When a state official reasonably

14 believes his or her acts were lawful in light of clearly established law and the information they

15 possessed, the official may claim qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227

16 (1991) (per curiam); *Orin v. Barclay*, 272 F.3d 1207, 1214 (9th Cir. 2001). Where "the law did

17 not put the officer on notice that his conduct would be clearly unlawful, summary judgment

18 based on qualified immunity is appropriate." *Saucier v. Katz*, 533 U.S. 194, 202 (2001),

19 *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) ("while the sequence

20 set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").

21       In analyzing whether a defendant is entitled to qualified immunity, the court must

22 consider two issues. The court must determine whether the plaintiff alleges a deprivation of

23 a constitutional right, assuming the truth of his factual allegations, and whether the right at

24 issue was "clearly established" at the time of defendant's alleged misconduct. *Clouthier v.*

25 *County of Contra Costa*, 591 F.3d 1232, 1241 (2010) (quoting *Pearson*, 555 U.S. 223, 129 S.Ct.

26 at 816 (2009)). "Whether a right is clearly established turns on the 'objective legal

27

28                                                    23

1  reasonableness of the action, assessed in light of the legal rules that were clearly established

2  at the time it was taken.'" *Id.* (quoting *Pearson*, 555 U.S. 223, 129 S.Ct. at 822).

3        When analyzing a claim of qualified immunity, the court must view the facts in the light

4  most favorable to Plaintiff. *Saucier*, 533 U.S. at 201.  Here, when viewing the facts in the light

5  most favorable to Plaintiff, Lopez shoved a shotgun into Plaintiff's chest while demanding

6  Plaintiff's inmate identification card, and subsequently applied force to Plaintiff's hands and

7  shoved him into an office window.  Plaintiff also asserts that Lopez filed disciplinary charges

8  in retaliation for reporting the initial incident in the culinary.  While there is a dispute as to the

9  purpose behind Lopez's conduct, viewing the facts in the light most favorable to Plaintiff, a

10  reasonable jury could find that Lopez's actions were not in furtherance of a legitimate

11  penological purpose. Accordingly, the court finds that Plaintiff has presented claims of excessive

12  force and retaliation under the facts alleged.  In February 2008, when the relevant actions took

13  place, the general law concerning excessive force was clearly established. *See Hudson v.*

14  *McMillian*, 503 U.S. 1, 6-8 (1992) (use of excessive force against prisoner violates Eighth

15  Amendment even when plaintiff suffers no significant injury), *Whitley v. Albers*, 475 U.S. 312

16  (1986) (unnecessary and wanton infliction of pain against prisoner violates Eighth Amendment).

17   The law concerning retaliation was also clearly established at this time. *See Pratt v. Rowland*,

18  65 F.3d 802 (9th Cir. 2005); *Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005).  A reasonable

19  officer therefore would  have been on notice that shoving a shot gun into the chest of an inmate

20  and unnecessarily shoving an inmate into a window may constitute excessive force.   A

21  reasonable officer would likewise be on notice that filing disciplinary charges because a prisoner

22  reported conduct amounting to excessive force would be considered retaliatory.

23  / / /

24  / / /

25  / / /

26  / / /

27

28                                                              24

Upon resolution of factual issues, Lopez may well be relieved of liability in this case; however, if Plaintiff's version of events were to prevail at trial, a jury might determine that the conduct amounted to a constitutional violation. Under such circumstances, the actions are not protected by qualified immunity. Therefore, summary judgment is not appropriate on this ground.

## IV. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the District Judge enter an Order **GRANTING IN PART AND DENYING IN PART** Defendants' motion as follows:

- Summary Judgment on the ground that Plaintiff failed to exhaust his nonjudicial remedies, construed by the court as an unenumerated 12(b) motion, should be denied.

- Summary Judgment should be denied as to Plaintiff's excessive force claims set forth in Count I.

- Summary Judgment should be granted as to Plaintiff's conspiracy claim set forth in Count I.

- Summary Judgment should be granted as to Plaintiff's state law claims set forth in Count I under NRS §212.020 and NRS § 197.200.

- Summary Judgment should be denied as to Plaintiff's retaliation claim set forth in Count II.

- Summary Judgment should be granted as to Defendants Baca, Watson, and Hardy.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

1         2.     That this Report and Recommendation is not an appealable order and that any

2  notice of appeal pursuant to Rule 4(a)(1), Fed. R. Civ. P., should not be filed until entry of the

3  District Court's judgment.

4         DATED:  January 19, 2011.

5

6    _____

7    UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28